McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
88 Pine Street
24th Floor
New York, NY 10005
Attorneys for Defendant/Third Party Plaintiff, Lincoln National Life Insurance Company

By: _____
    Steven P. Del Mauro, Esq.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JIMMY NEGRON, as Trustee of the Rose Irizarry 2008 Life Insurance Trust, | : |
| | : |
| Plaintiff, | : |
| | : Civil Action No. 11-cv-00363 (NGG)(RML) |
| vs. | : |
| | : |
| LINCOLN NATIONAL LIFE INSURANCE COMPANY, | : |
| | : |
| Defendant. | : |
| | : |
| And | : |
| | : |
| LINCOLN NATIONAL LIFE INSURANCE COMPANY, | : |
| | : |
| Third-Party Plaintiff, | : |
| | : |
| vs. | : |
| | : |
| MATTHEW FISCHER, THE ESTATE OF ROSE IRIZARRY, JACOB WEINDLING, LIBERTY PLANNING, INC., THE ROCKLYN GROUP, LTD AND CHAIM MAYER LEBOVITS, | : |
| | : |
| Third Party Defendants. | : |
| | : |

## CIVIL ACTION – ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM AND THIRD PARTY COMPLAINT ON BEHALF OF LINCOLN NATIONAL LIFE INSURANCE COMPANY

Lincoln National Life Insurance Company ("Lincoln National") by and through its attorneys, McElroy, Deutsch, Mulvaney & Carpenter, LLP, by way of answer to the complaint filed on behalf of Jimmy Negron ("Negron"), as Trustee of the Rose Irizarry 2008 Life Insurance Trust, alleges and says:

1.      Lincoln National is without sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 1 and leaves Negron to his proofs.

2.      Lincoln National denies the allegations contained in paragraph 2, except to admit it is an insurance company.

3.      Lincoln National denies the allegations contained in paragraph 3, except to admit to the issuance of a policy of life insurance bearing policy no. JJ-7040713 which insured the life of Rose Irizarry with a face amount death benefit of $5,000,000.00 ("Policy").

4.      Lincoln National is without sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 4 except to admit Rose Irizarry ("Irizarry" or "Decedent") expired on July 6, 2010.

5.      Lincoln National is without sufficient information to form a belief as to the truth or falsity of the allegations contained in paragraph 5, except to admit to the receipt of premiums under the policy of life insurance.

6.      Lincoln National denies the allegations contained in paragraph 6 and begs leave to refer to the allegations and causes of action set forth in the counterclaim and third party complaint.

7.      Lincoln National is without sufficient information to form a belief as to the truth or

falsity of the allegations contained in paragraph 7, except to admit to the receipt of notice of the death of Irizarry.

8.      Lincoln National admits to not having paid the death benefit under the policy of life insurance bearing policy no. JJ-7040713, and incorporates herein by reference each allegation set forth in the third party complaint and counter claim as if set forth in length.

9.      Lincoln National admits to not having paid the death benefit under the policy of life insurance bearing policy no. JJ-7040713, and incorporates herein by reference each allegation set forth in the third party complaint and counter claim as if set forth in length.

10.     Lincoln National denies the allegations contained in paragraph 10.

11.     Lincoln National denies the allegations contained in paragraph 11.

12.     Lincoln National denies the allegations contained in paragraph 12.

## AFFIRMATIVE DEFENSES

1.      The complaint fails to state a claim upon which relief may be granted.

2.      The causes of action and/or relief sought should be barred and/or precluded by virtue of the doctrine of waiver.

3.      The causes of action and/or relief sought should be barred and/or precluded by virtue of the doctrine of laches.

4.      The causes of action and/or relief sought should be barred and/or precluded by virtue of the doctrine of estoppel.

5.      The causes of action and/or relief sought should be barred and/or precluded by virtue of the doctrine of unclean hands.

6.      The causes of action and/or relief sought should be barred and/or precluded by virtue of plaintiff's fraud and/or misrepresentation.

7.     The causes of action and/or relief sought should be barred and/or precluded by virtue of the doctrine of unjust enrichment.

8.     The causes of action and/or relief sought should be barred and/or precluded by virtue of plaintiff's breach of contract.

9.     The cause of action and/or relief sought should be barred and/or precluded by virtue of the incontestability provision contained in the policy of life insurance.

10.    The cause of action and/or relief sought should be barred and/or precluded by virtue that the policy of life insurance was issued in accordance with and pursuant to the laws of the State of New Jersey.  The law of the State of New Jersey is applicable.

11.    The cause of action and/or relief sought should be barred and/or precluded by virtue of the New Jersey Insurance Fraud Prevention Act, <u>N.J.S.A.</u> 17:33A-1, <u>et</u> <u>seq.</u>

12.    The causes of action and/or relief sought should be barred and/or precluded by virtue of plaintiff's breach of the duties of good faith, honesty and integrity.

13.    The causes of action and/or relief sought should be barred and/or precluded by virtue of the doctrine of avoidable consequences.

14.    The causes of action and/or relief sought should be barred and/or precluded by virtue of the applicable period and/or statute of limitations.

15.    The causes of action and/or relief sought should be barred and/or precluded by virtue of plaintiff's ratification, adoption, authorization and/or acquiescence in the actions and/or omissions complained of.

16.    The causes of action and/or relief sought should be barred and/or precluded by virtue that the actions and/or omissions complained of were the direct and proximate result of third parties over whom this answering defendant exercised no control.

17.     The causes of action and/or relief sought should be barred and/or precluded by virtue of plaintiff's failure to mitigate the damages sustained.

18.     The cause of action and/or relief sought should be barred and/or precluded by virtue of the fraudulent procurement of the policy of life insurance.

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Lincoln National by way of counterclaim against Negron and third-party complaint against third-party defendants Matthew Fischer, as Trustee of the Rose Irizarry 2008 Life Insurance Trust, The Estate of Rose Irizarry, Jacob Weindling, Liberty Planning, Inc., The Rocklyn Group, Ltd. and Chaim Mayer Lebovits ("Third Party Defendants") jointly, severally or in the alternative alleges and says:

## PARTIES

1.     Lincoln National is, and during all times relevant has been, in the business of underwriting policies and certificates of life insurance and is authorized to transact the business of insurance in the State of New Jersey.  Lincoln National is a corporation organized under the laws of the State of Indiana where it maintains its principal place of business.  Lincoln National is a citizen of the State of Indiana within the meaning and intent of 28 U.S.C. § 1332

2.     The Rose Irizarry 2008 Life Insurance Trust ("Life Insurance Trust") is purportedly established governed and to be construed in accordance with the laws of the State of New Jersey. Upon information and belief, however, the Life Insurance Trust was the product of fraud and is a complete sham established solely for the purpose of profit for outside investors.  The Life Insurance Trust is a citizen of the State of New Jersey within the meaning and intent of 28 U.S.C. § 1332

3.     Negron is a designated Trustee of the Life Insurance Trust.  Negron maintains a

4

primary residence and domiciliary located at 1607 Forster Street, Harrisburg, PA 11713 and is a citizen of the State of Pennsylvania within the meaning and intent of 28 U.S.C. § 1332.

4.      Matthew Fischer ("Fischer") is a designated Trustee of the Life Insurance Trust. Fischer maintains a primary residence and domiciliary located at 1921 52nd Street, Brooklyn, New York 08701 and is a citizen of the State of New York within the meaning and intent of 28 U.S.C. § 1332.

5.      Irizarry was the proposed insured and maintained a primary residence and domiciliary located at 318 6th Street, Brooklyn, New York 11216 at the time of her death.  The Estate of Rose Irizarry ("Estate") is a citizen of the State of New York within the meaning and intent of 28 U.S.C. § 1332.

6.      Jacob Weindling ("Weindling") is a licensed insurance producer who assisted Negron, Fischer and Irizarry in procuring a certificate of life insurance from Lincoln National.  On information and belief Weindling maintains a residence and domiciliary located at 1727 51st Street, Brooklyn, New York 11204 and is a citizen of the State of New York within the meaning and intent of 28 U.S.C. § 1332.

7.      Liberty Planning, Inc. ("Liberty") is an insurance agency maintaining a primary place of business located at 17 Monsey Blvd. Monsey, New York 10952.  Liberty is a domestic business corporation organized under the laws of the State of New York and is a citizen of the State of New York within the meaning and intent of 28 U.S.C. § 1332.

8.      The Rocklyn Group, Ltd. ("Rocklyn") is an insurance agency maintaining a primary place of business located at 17 Monsey Blvd. Monsey, New York 10952.  Rocklyn is a domestic business corporation organized under the laws of the State of New York and is a citizen of the State of New York within the meaning and intent of 28 U.S.C. § 1332.

9.      Chaim Mayer Lebovits ("Lebovits") is a licensed insurance agent and the Chairman or Chief Executive Officer of Liberty and Rocklyn.  On information and belief Lebovits maintains a residence and domiciliary located at 287 Division Avenue 2-E, Brooklyn, New York 11211 and is a citizen of the State of New York within the meaning and intent of 28 U.S.C. § 1332

## JURISDICTION

10.     There is complete diversity of citizenship between the parties to this civil action within the meaning and intent of 28 U.S.C. §1332.

11.     The amount in controversy between the parties exceeds the sum of $75,000.00, exclusive of interest and costs of suit.

12.     This Court maintains original jurisdiction based on diversity of citizenship of the within parties pursuant to 28 U.S.C. §1332.

13.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other causes of action related to the original cause of action.

## BACKGROUND

## STRANGER-ORIGINATED LIFE INSURANCE

14.     In recent years, a secondary market has emerged in which speculative investors have sought to obtain, and in many cases have succeeded in obtaining, a pecuniary interest in life insurance policies on individuals with whom they have no prior relationship.  Although there are other varieties of secondary market transactions, the most problematic scenario of which is where the insured and/or policy owner intended at the inception for the policy or a beneficial interest in the entity that owns the policy to be sold and the speculators acquire or agree to acquire an interest in the life insurance policy.

15.     These speculators do not acquire an interest in life insurance policies insuring the

lives of persons with whom they have a familiar relationship, or in whose longevity they possess a legally recognized interest; instead, these speculators purchase policies that insure the lives of strangers - - or, in many cases, purchase beneficial interest in an insurance trust or ownership in shell corporations that own those policies - - in the expectation that they will profit by the death of the insured.  No insurable interest exists between the speculators and the persons whose life is insured.  Such arrangements are commonly referred to as an IOLI ("Investor-Originated Life Insurance") or STOLI ("Stranger-Originated Life Insurance,") sometimes known as ("Stranger-Owned Life Insurance.")

16.     STOLI transactions run afoul of state insurable interest laws which protect the integrity of life insurance by requiring that a policy owner had a cognizable interest in the longevity of the insured at the time the policy is issued.

17.     Speculators, who are the true intended owners of the STOLI policies, attempt to circumvent these laws by constructing their transactions in order to hide these impermissible investments.  All STOLI programs have one thing in common:  their objective is to give investors who have no insurable interest in the life of the insured a stake in the life insurance policy of a complete stranger.

18.     Often, applications seeking the issuance of these life insurance policies contain material misrepresentations pertaining to the proposed insured's net income, net worth, occupation and other life insurance in force or applied for, and in some cases, the application and trust documents submitted to the insured during the underwriting of the policy contain forged signatures of the proposed insured.

19.     In some cases, the proposed insured lacks the requisite knowledge and consent to the life insurance policy, which was procured by the fraud and misrepresentation of these stranger

investors.

20.     A typical STOLI transaction was described by the Court as follows:

This case concerns an aspect of a growing cottage industry in the insurance market, known as stranger-owned life insurance policies of "STOLI" plans, in which an individual, typically an elderly one, procures life insurance on his own life in order to subsequently assign the policy to a third party following the lapse of the two-year contestable period.  STOLI transactions are the product of the burgeoning "life settlements" market, in which insureds sell unneeded or unaffordable permanent policies to investors.  See Jensen & Leimberg, 885 supra, at 111. STOLI schemes emerged as investors demand for these policies exceeded supply, leading industry speculators to solicit insureds to take out additional policies, even if the insureds had no particular need for supplemental insurance coverage.  Often, the insureds are persuaded to engage in these STOLI transactions because their bank accounts have run dry and they are forced to spend increasing amounts of money on medical care.  As one court put it, "[o]ften pejoratively, termed 'stranger-owned life insurance policies' these policies enable the insured to obtain ready cash by selling his policy to a stranger whose only interest in the insured is his early demise."  Life Pro. Clearing LLC v. Angel, 520 F.Supp.2d 646, 648 (S.D.N.Y. 2008).

A typical STOLI transaction is structured as follows.  An agent attempts to sell a life insurance policy to an elderly insurable candidate, and offers the candidate up-front cash in exchange for promising a future sale of the policy.  The agent informs the candidate that the candidate will be able to obtain the policy at virtually no cost to himself, because the agent has secured non-recourse financing to purchase the policy.  The candidate then acts as a "nominal grantor" of a life insurance trust than is used to apply for the policy.  At that time, the agent will tell the insured that, in all probability, the policy will be sold to investors for a price that will pay the loan and accrued interest, leaving a profit to split between the agent and the insured… If the insured survives the two-year contestability period on the policy], the owner (the life insurance trustee) typically has two options, in addition to the sale of the policies to investors:  (1) have the insured pay the outstanding debt with accrued interest and retain the policy; or (2) transfer the policy to the lender in lieu of foreclosure."  Jensen & Leimberg, supra, at 111.  The insureds are usually able to garner significantly greater sums from speculators than they would receive by surrendering the policy to the insurance company.  See Liam Pleven & Rachel Emma Silverman, Cashing in An Insurance Man Builds A Lively Business in Death-As Life Settlements Boom, Banks, Regulators Circle, Wall St. J., Nov. 27, 2007, at A1.

Lincoln National Life Insurance Company v. Calhoun, et al., 596 F. Supp. 2d 882 884-885, (D.N.J. 2009)

21.     As described by another court:

8

In such an arrangement (stranger-originated life insurance or investor-initiated life insurance) a policy is purchased, not with a view of the insured paying premiums for the benefit of the insured's family, but with a view toward reselling the policy to an "outside investor" in a secondary market for the life insurance. The outside investor pays the insured in order to make a "wager" on the duration of the insured's life.

*   *   *

Under New York Law, as well as the long-standing public policy recognized by New York courts, it is illegal for anyone to procure, or cause to be procured, a life insurance policy on an insured for the benefit of an outside investor who does not have an insurable interest in the insured.  To conceal the real policyholder's lack of insurable interest from the insurer, as well as to induce the insured's application, investors establish an irrevocable trust solely to hold the target insurance policy. The trust is established around the time that the insured submits his application, and is named as the owner and beneficiary of the policy with the beneficiary being entitled to the death benefits payable under the policy.  The beneficiary of the trust is typically disclosed to the insurer and designed as the insured or a family member. Once the policy is issued, the insured transfers the beneficial interest in the policy to an outside investor in exchange for a significant lump sum payment.

Phoenix Life Ins. v. Irwin Levinson Ins. Tr. II, 209 New York Slip Op. 30383.

## FACTUAL ALLEGATIONS

22.     On July 14, 2008, Negron and Fischer, purporting to be Trustees of the Life Insurance Trust as policy owner, and Irizarry purporting to be the proposed insured, executed an application seeking the issuance of a certificate of insurance containing a specified amount death benefit of $5,000,000.00.

23.     The application was purportedly executed in New Jersey with Weindling, as the insurance producer, who assisted Negron, Fischer and Irizarry with completion of the application and witnessed the signatures.  The insurance application seeking the issuance of the certificate of life insurance is fully incorporated herein by reference as if the same was fully set forth at length.

24.     In executing the insurance application, Negron, Fischer, Irizarry and Weindling knew that they were required to provide truthful, accurate and honest answers to the questions

9

present on the insurance applications.

25.     In executing the insurance application, Negron, Fischer, Irizarry and Weindling knew that Lincoln National would rely upon the answers recorded on the insurance applications in determining whether Irizarry was insurable and otherwise qualified for the certificate of life insurance applied for.

26.     In executing the insurance application, Negron, Fischer, Irizarry and Weindling knew they may be subject to civil and/or criminal penalties in the event Negron, Fischer and Irizarry knowingly made false statements in order to obtain the certificate of life insurance.

27.     In executing the insurance application seeking the issuance of the certificate of life insurance, Negron, Fischer and Irizarry provided the following answers to the questions contained thereon:

### APPLICATION FOR GROUP LIFE INSURANCE CERTIFICATE - PART I

### PROPOSED INSURED A

| | | |
|---|---|---|
| 12. | Annual Earned Income | $0 |
| 13. | Annual Unearned Income | $475,000 |
| 14. | Total Assets: | $8,250.000 |
| 15. | Total Liabilities: | $0 |
| 16. | Net Worth: | $8,250,000 |

\*     \*     \*

19.     **What is the total amount of all inforce insurance on your life? (Please list in box below)        If none, check this box:☒**

\*     \*     \*

22.     **Will you, the proposed insured and/or beneficiary, and/or any entity on your behalf, receive any compensation, whether via the form of cash, property, an agreement to pay money in the future, a percentage of the death benefit, or otherwise, if this certificate is issued? (If "Yes", provide details in Question 26.)        ☐ Yes   ☒ No**

23. Have you, the proposed insured, been involved in any discussion about the possible sale or assignment of this certificate or a beneficial interest in a trust, LLC, or other entity created or to be created on your behalf?  *(If "Yes", provide details in Question 26.)* ☐ Yes  ☒ No

24. Have you, the proposed insured, ever sold any life insurance or annuity contracts to a life settlement, viatical or other secondary market provider, or are you in the process of selling any life insurance or annuity contracts? *(If "Yes", provide details in Question 26.)* ☐ Yes  ☒ No

25. Is this certificate being funded via a premium financing loan or with funds borrowed, advanced or paid from another person or entity?  *(If "Yes", please complete the Premium Financing Application Supplement)* ☐ Yes  ☒ No

\*   \*   \*

OWNER INFORMATION

35. Will you, the proposed owner and/or beneficiary, and/or any entity on your behalf, receive any compensation, whether via the form of cash, property, an agreement to pay money in the future, a percentage of the death benefit, or otherwise, if this certificate is issued? *(If "Yes", provide details in Question 38.)* ☐ Yes  ☒ No

36. Have you, the proposed owner, been involved in any discussion about the possible sale or assignment of this certificate or a beneficial interest in a trust, LLC, or other entity created or to be created on your behalf?  *(If "Yes", provide details in Question 38.)* ☐ Yes  ☒ No

37. Is this certificate being funded via a premium financing loan or with funds borrowed, advanced or paid from another person or entity?  *(If "Yes", please complete the Premium Financing Application Supplement)* ☐ Yes  ☒ No

28.    Through and by virtue of the execution of the application seeking the issuance of a

certificate of life insurance, Negron, Fischer and Irizarry represented, acknowledged and agreed:

AGREEMENT AND ACKNOWLEDGMENT

11

Each of the Undersigned declares that:

1.     This Application consists of: a)  Part I Application;  b)  Part II Medical Application, if required;  c)  any amendments to the application(s) attached thereto; and d) any supplements, all of which are required by the Company for the plan, amount and benefits applied for.

2.     I/We further agree that (except as provided in the Temporary Life Agreement if advance payment has been made and acknowledged below and such Agreement is issued), insurance will take effect under the Certificate only when:  1) the Certificate has been delivered to and accepted by me/us; 2) the initial premium has been paid in full during the lifetime of the Proposed Insured(s); and 3)  the Proposed Insured(s) remain in the same state of health and insurability as described in each part of the application at the time conditions 1) and 2) are met.

3.     No agent, broker or medical examiner has the authority to make or modify any Company certificate or to waive any of the Company's requirements.

4.     I HAVE READ, or have had read to me, the completed Application for Life Insurance before signing below. All statements and answers in this application are correctly recorded, and are full, complete and true.

## STATE DISCLOSURE

**Any person who includes any false or misleading information on an application for a group life insurance certificate is subject to criminal and civil penalties.**

## TRUST VERIFICATION

**I/WE hereby certify that the Trustee(s) named in this application are the Trustee(s) for the named Trust, which is in full force and effect. The Company assumes no obligations to inquire into the terms of any trust agreement affecting this certificate and shall not be held liable for any party's compliance with the terms thereof. The Company may rely solely upon the signature(s) of the Trustee(s) named in this application to any receipt, release or waiver, or to any transfer or other instrument affecting this certificate or any options, privileges or benefits thereunder. Unless otherwise indicated, the signature(s) of all Trustee(s) named, or their successors, will be required to exercise any contractual right under the certificate. The Company shall have no obligations to see to the use or application of any funds paid to the Trustee(s) in accordance with the terms of the certificate. Any such payment made by the Company to the Trustee(s) shall fully discharge the Company with respect to any amounts so paid.**

29.     On May 4, 2008, Irizarry provided answers to the **MEDICAL SUPPLEMENT**

(Part II of Application – To be completed by Medical Examiner).   The **MEDICAL SUPPLEMENT (Part II of Application – To be completed by Medical Examiner)** is fully incorporated herein by reference as if set forth at length.

30.     In executing the **MEDICAL SUPPLEMENT (Part II of Application – To be completed by Medical Examiner)** Irizarry knew that Lincoln National would rely upon the answers recorded in determining whether she was insurable and/or qualified for the policy applied for.

31.     Through and by virtue of the execution of the **MEDICAL SUPPLEMENT (Part II of Application – To be completed by Medical Examiner)**, Irizarry represented, acknowledged and declared:

> I have read or have had read to me the complete Medical Supplement before signing below.   All statement and answers in this Supplement are correctly recorded and are full, complete and true.   I agree that this Medical Supplement constitutes a part of the application for insurance and is to be attached to and made a part of the policy.   I understand that any material misrepresentations may result in loss of coverage under the policy.

32.     To facilitate the underwriting process and the issuance of the certificate of life insurance, Weindling also responded to questions contained in the "**AGENT'S REPORT**."   The **AGENT'S REPORT** is fully incorporated herein as if fully set forth at length.

33.     In executing the **AGENT'S REPORT**, Weindling provided the following answers to the questions contained thereon:

> 4.(a)   Is this policy being paid for with a premium financing loan?
> ☐ **Yes**   ☒ **No**
>
> (b)   Is this policy being paid for with a premium financing loan?
> ☐ **Yes**   ☒ **No**

34.     To facilitate the underwriting process and the issuance of the certificate of life insurance, Weindling also responded to questions contained in the applications under the heading

13

"**AGENT CERTIFICATION**" as follows:

> ➤ I declare that I asked the Proposed Insured(s) each question on the application. I have recorded the answers exactly as stated and I know of nothing affecting the insurability of the Proposed Insured(s) which is not fully recorded in this application.

> ➤ I declare that I have provided each Proposed Insured and Owner with the Important Notices as well as a copy of the Privacy Practices Notice.

> ➤ I declare that if replacement is involved, I certify that only company approved sales materials were used in this sale and that copies of all sales materials were left with the applicant.

> ➤ I declare that I have not been involved in any recommendation regarding the possible sale or assignment of this policy to a life settlement, viatical or other secondary market provider. If otherwise, please explain: _____.

> ➤ I declare that I have verified that all life insurance coverage in force, or in the process of being applied for, on the proposed insured has been disclosed on this application, including any coverage that has been sold or is in the process of being sold to a life settlement, viatical or other secondary market provider.

> ➤ I declare, to the best of my knowledge, that this policy is not being funded via non-recourse premium financing and is not being paid for with funds from any person or entity whose only interest in the policy is the potential for earnings based on the provisions of funding for the policy. If otherwise, please explain: _____.

> ➤ I declare that I have accurately answered all questions contained in the Agent's Report in connection with this application.

35.   On July 14, 2008, Negron, as policy owner, and Irizarry as proposed insured, executed an **INSURED & OWNER PREMIUM FINANCING QUESTIONNAIRE** to facilitate underwriting of the insurance application. Weindling purportedly witnessed Negron's and Irizarry's execution of the **INSURED & OWNER PREMIUM FINANCING QUESTIONNAIRE** in the state of New Jersey. The **INSURED & OWNER PREMIUM FINANCING QUESTIONNAIRE** is fully incorporated herein as if fully set forth at length.

14

36.    In   executing   the   **INSURED   &   OWNER   PREMIUM   FINANCING**

**QUESTIONNAIRE**, Negron and Irizarry provided the following answers to the questions

contained thereon:

1)    Do you expect to keep this new life insurance policy for at least five years?

Insured: Yes __X__ No ____ Owner/Applicant (if different from insured): Yes __X__ No ____

2)    Please provide the name, address, and contact information for the lender (or other
person or entity who is providing the funds to pay the premiums for this new life insurance
policy) "N/A"

3)    Is the life insurance policy the only collateral for the loan?  Yes ___ No ___   "N/A"

4)    Were you given a copy of a loan term sheet that shows the loan interest rate, loan
origination fees, maturity date, and pre-payment penalties or fees?          "N/A"

5)    If this policy is issued, have you (or a family member or other party of your choice)
been offered any cash payment, free trip, or any other thing of value? "N/A"

Insured: Yes ___ No__X__ Owner/Applicant (if different from insured): Yes ___ No__X

6)    Have you discussed, or been assured in writing or otherwise, that regardless of the
loan balance or the case surrender value of the policy, you can fully satisfy the outstanding
loan by simply transferring all or a portion of your rights in the life insurance policy to the
lender or another party?   "N/A"

Insured: Yes ____ No__X__ Owner/Applicant (if different from insured): Yes ___ No__X

7)    Have you had any discussions about the eventual sale of this new life insurance
policy, including any indirect sale of the trust, partnership, or other entity that owns the
contract?

Insured: Yes ____ No__X__ Owner/Applicant (if different from insured): Yes ___ No__X

8)    Have you, in the last two years, authorized a life expectancy valuation to be
performed? Or, have you been asked to have a life expectancy valuation in the future?
[This question is for the Insured only]

Insured: Yes ____ No__X

37.    In   executing   the   **INSURED   &   OWNER   PREMIUM   FINANCING**

**QUESTIONNAIRE** on July 14, 2008, Negron, as policy owner, and Irizarry as proposed insured, represented and agreed:

> I have read or have had read to me the complete Questionnaire before signing below. All statements and answers in this Questionnaire are correctly recorded and are full, complete and true. I understand that the information being provided in this Questionnaire is being relied upon in considering my application for life insurance.

38.   On July 14, 2008, Fischer, as policy owner, and Weindling as agent, executed an **OUT OF STATE SALE VERIFICATION FORM** in the State of New Jersey to facilitate the underwriting of the certificate of life insurance. The **OUT OF STATE SALE VERIFICATION FORM** is fully incorporated herein as if fully set forth at length.

39.   In executing the **OUT OF STATE SALE VERIFICATION FORM** Fischer and Weindling represented, acknowledged and agreed:

> This form must be completed if the owner is a resident of New York or Montana and the application is taken outside the state of residence. Complete and return with the application.
>
> State of Residence of Owner_____ NY _____
>
> State in Which Application Was Signed____ NJ _____
>
>
> The undersigned, by signing below, confirm that the policy or contract was principally negotiated, issued and delivered in the state where the application was signed. Communications between the agent and the owner pertaining to the sale, solicitations and negotiation of the policy or contract, including the signing of the application, the collection of initial premium and the issuance and delivery of the policy/contract to the proposed owner have taken or will take place principally outside of New York or Montana, as appropriate.

40.   On July 14, 2008, Weindling as Producer or Representative executed a **REQUIRED PRODUCER & RERPRESNTATIVE CERTIFICATION REGARDING INVESTOR OWNED LIFE INSURANCE** in the State of New Jersey to facilitate the underwriting of the certificate of life insurance. The **REQUIRED PRODUCER &**

16

REPRESENTATIVE CERTIFICATION REGARDING INVESTOR OWNED LIFE INSURANCE included the **LINCOLN POLICY REGARDING INVESTOR OWNED LIFE INSURANCE** and is fully incorporated herein as if fully set forth at length.

41.   In   executing   the   **REQUIRED PRODUCER & REPRESENTATIVE CERTIFICATION REGARDING INVESTOR OWNED LIFE INSURANCE** Weindling provided the following answers to the questions contained thereon:

> 1)   Will the Insured or Owner/Applicant receive any compensation as a result of the issuance of this policy, other than the benefits provided by the policy? In answering this question, I am including any direct or indirect payment to a family member, beneficiary, business partner, charity or other entity receiving compensation on behalf of the Insured or Owner/Applicant.
>
> Yes ___ No__X__
>
> 2)   Is any premium financing contemplated to pay the initial or future premiums for this policy?
>
> Yes ___ No__X__
>
> 3)   If the policy will be owned by a trust, limited liability company or entity created or to be created for the Insured's behalf, are you aware of any business or financial relationship between the trustee or entity managers and any premium financing, life settlement viatical, or other secondary market provider?
>
> Yes ___ No__X__

42.   In   executing   the   **REQUIRED PRODUCER & REPRESENTATIVE CERTIFICATION REGARDING INVESTOR OWNED LIFE INSURANCE** Weindling certified:

> By my signature below, I declare and certify that I have read and understand the Lincoln Policy Regarding Investor Owned Life Insurance, and it is my understanding that this life insurance policy is being applied for does not violate the stated intent and spirit of the Lincoln Policy Regarding Investor Owned Life Insurance. I declare and certify that the information contained in the Certification is true, correct and complete to the best of my knowledge, information and belief.

43.   Following completion of the insurance applications, the application was forwarded

17

by Weindling to Lebovits at Liberty Planning under cover of a letter dated July 17, 2008.

44.     The application was submitted to Lincoln National by Liberty Planning on July 17, 2008, together with Administrative UL, Agent's report, HIPAA, Customer ID verification, HIV consent form NJ, HIV consent form NY, Notice of Replacement, Illustration Certification, Premium Financing Questionnaire, Out of State Sale Verification, Agent Certification, 1st and last pages of trust, Lab Slip, MD Exam and EKG.  The transmittal further indicated that an Inspection Report was ordered and will be submitted shortly.

45.     Following completion of the insurance applications, Weindling, Liberty, Rocklyn and Lebovits provided Lincoln National with additional information to facilitate the underwriting of the certificate of life insurance.

46.     On July 18, 2008, Lincoln National acknowledged receipt of the application by email to Liberty Planning and requested additional information including an unsigned illustration, inspection report, an explanation why the application was signed in New Jersey and a New Jersey application used when the insured and owner purportedly reside in New York, a letter explaining how the face amount was calculated, the source of funds to pay the premiums and a Motor Vehicle Report.

47.     On August 5, 2008, Lebovits sent an email to Lincoln National to facilitate the underwriting of the certificate of life insurance that set forth the following:

> Attached Please find the cover letter from the Agent on this case along with the Estate Plan.

> Please note the Trustee Works in NJ, and that?s [sic] why it was processed as NJ case.

48.     The cover letter from the Agent was the July 17, 2008, correspondence from Weindling to Lebovits that set forth:

Mrs. Irizarry is a 72 Year old Lady with an annual income of almost a [sic] $500,000 and a net worth over $8,000,000, based on 4% growth, in ten years her net worth will be over $12,000,000, based on 45% Estate Settlement Costs, her liability at death would be at about $5,500,000.

49.   The Inspection Report obtained by Liberty Planning to facilitate the underwriting of the certificate of life insurance was forwarded to Lincoln National on August 1, 2008.

50.   The Inspection Report was completed by Info Link Services, a division of Hooper Holmes, Inc., and forwarded to Lincoln National by Jewel Strader ("Strader"), which purportedly contains the Insured's answers to questions and verifies written representations made in connection with the insurance application.

51.   Upon information and belief, the New York State Insurance Department has received other insurance company fraud reports detailing questionable procedures by Strader involving the reliability and validity of the insured's income and net worth information Srader has put into inspection reports for other companies.

52.   The Inspection Report was completed on July 29, 2008, and set forth:

| INCOME / FINANCIAL | 1. Annual Earned Income:      $ 0 |
| | 2. Annual Unearned Income:   $ 475,000 |

2a. Source: (rent, dividends, etc.) Rental, interest, and dividends

3. Estimated Net Worth: $8,250,000 (Assets are primarily comprised of real   4. Spouse's Income:  n/a
estate valued at $8,000,000. There are no
outstanding liabilities.)

5. Any financial problems such as bankruptcy, judgments, liens, etc?  No

53.   On information and belief, Strader knowingly and intentionally conspired with Lebovits, Weindling, Lincoln and Rocklyn for the purpose of creating and submitting fictitious inspection reports to Lincoln National in connection with the insurance application.

54.   On the basis of the statements and representations contained in the written insurance applications, and in reliance upon the complete candor, honesty and openness of Negron

Fischer and Irizarry in disclosing information in response to the questions present on the applications, Lincoln National approved the issuance of a certificate of life insurance bearing certificate no. JJ-7040713.

55.     The certificate of life insurance bearing certificate no. JJ-7040713 was delivered on August 13, 2008, at which time Fischer as Owner and Weindling as Agent executed the delivery receipt and signed illustration and tendered the first premium in the amount of $105,000.00 required to place the certificate of life insurance in force and effect.

56.     Lincoln National received the executed delivery receipt and signed illustration and payment of first premium in the amount of $105,000.00 on August 14, 2008, and issued an Endorsement changing the Certificate Date from August 8, 2008 to August 14, 2008.

57.     The certificate of life insurance bearing certificate no. JJ 7040713 provides a face amount death benefit of $5,000,000.00, designates the Rose Irizarry 2008 Life Insurance Trust as policy owner and primary beneficiary and insures the life of Irizarry.

58.     In connection with the issuance of the certificate of life insurance, Lincoln National paid broker commissions and incurred additional costs and expenses.  On information and belief, the costs, expenses and brokerage commissions exceed the premiums that Lincoln National has received to date for coverage under the certificate of life insurance.

**Death Claim and Contestable Claim Investigation**

59.     The Decedent expired on July 6, 2010, within the two year contestability period.

60.     On or about July 21, 2008, Lincoln National received a Death Certificate for the Decedent via mail without any contact information.

61.     Following receipt of the Death Certificate Lincoln National sent July 28, 2010, correspondence to Negron advising that as the insured's death occurred within two years of the

issue date of the policy a routine inquiry would be made in accordance with the Incontestable provision of the policy to confirm the information given when the application was taken.  The correspondence further provided a Claimant's Statement and Distinctive Payee Arrangement Form, to be completed and signed and requested a copy of Life Insurance Trust and the Life Insurance Trust Tax ID number.

62.     Personal contact was made with Negron on August 10, 2010, and request was made for an appointment on August 17, 2010.

63.     Negron was contacted on August 16, 2010, to schedule his interview, but Negron declined the interview.

64.     As Lincoln National did not receive a response to the July 28, 2010, correspondence sent to Negron, a second correspondence was sent on August 27, 2010, again requesting the information.

65.     Negron was contacted again by telephone on August 31, 2010, when he denied detailed knowledge of the insurance policy and he again declined an interview, indicating he would call Lincoln National in the future.

66.     An interview with Negron took place on September 20, 2010, during which time Negron declared and Lincoln National discovered, *inter alia*:

    a.  Negron had no knowledge of the Lincoln National Policy until the Decedent passed away and correspondence was received from Lincoln National.

    b.  Negron had nothing to do with the application process.

    c.  Negron was not present when the application was taken and has no idea how Decedent was contacted or by whom.

    d.  Negron remembered that approximately two years prior to her death, the Decedent

21

had him sign some papers and merely told him that it was regarding some insurance but he did not remember the particulars.

e.   At the time of the Decedent's death, Negron knew nothing about the Policy, the amount of the Policy or how it was set up.

f.   Negron did not know how the Decedent answered the questions on the application, whether it was in person or over the telephone.

g.   At the time of the Decedent's death, Negron was not familiar with Weindling.

h.   Negron had no knowledge of the Decedent's annual earned income or net worth.

i.   Negron was not aware of the Decedent having any real estate holdings and knew only that Decedent rented her residence at the time of her death.

j.   Negron had no knowledge of the Life Insurance Trust at the time of the Decedent's death and was not aware that he was a trustee, and did not know who funded the Life Insurance Trust.

k.   At the time of the Decedent's death, Negron did not know what a trust was or what a trustee would do

l.   Negron did not have any copies of the Life Insurance Trust agreement.

m.   Negron did not make any premium payments for the policy and did not know who paid the Policy premium payments.

n.   Negron had no knowledge of who Mathew Fischer was at the time of the Decedent's death.

o.   Negron first became aware of the Lincoln National policy after the death of Irizarry when he received paperwork from Lincoln National.

p.   Irizarry was insured under a policy of life insurance by Met Life Company of

Connecticut, P.O. Box 990087, Hartford, Connecticut 06199, policy number 7162314.

q.  The Met Life Company of Connecticut policy number 7162314 contained a face amount of $9,000.00.

r.  Irizarry was insured under a policy of life insurance by Presidential Life Insurance with a face amount of approximately $2,000.00.

67.     As Lincoln National did not receive a response to the July 28, 2010, correspondence sent to Negron, another correspondence was sent on September 20, 2010, again requesting the information.

68.     In connection with its contestable investigation Lincoln National left several messages for Negron requesting income tax returns of Irizarry from 2007-2009.

69.     In connection with Lincoln National's contestable investigation, on October 20, 2010, correspondence was sent to Negron again requesting information regarding the income tax returns of Irizarry from 2007-2009 and providing an authorization for execution by Negron that would allow Lincoln National to obtain the requested returns directly from the Internal Revenue Service.

70.     As Lincoln National did not receive a response to its prior correspondences another correspondence was sent to Negron on November 3, 2010, again requesting the same information.

71.     In connection with Lincoln National's contestable investigation additional attempts were made to contact Negron by telephone and messages were left for Negron with no response.

72.     In connection with Lincoln National's contestable investigation contact was made with Fischer on October 10, 2008, in an effort to schedule an interview.  Fischer advised the investigator he would advise when he would be available.

73.     In connection with Lincoln National's contestable investigation telephone messages

23

were left for Fischer on October 15, 20, 26, November 1, 8 and 15, 2010, without a response and he never submitted to the interview.

74.    The Total Assets of Rose Irizarry are not $8,250,000.00.

75.    The Net Worth of Rose Irizarry is not $8,250.000.00.

76.    The Annual Unearned Income of Rose Irizarry is not $475,000.00.

77.    Irizarry did not own any real estate.

78.    On information and belief compensation was paid to Irizarry and/or on her behalf to third persons whose identities remain unknown to Lincoln National at this time, in connection with the issuance of the certificate of life insurance bearing certificate no. JJ-1040713.

79.    On information and belief discussions were held between Irizarry, Negron, Fischer, Weindling, Lebovits and/or other third persons whose identities remain unknown to Lincoln National at this time about the sale or assignment of the certificate of life insurance bearing certificate no. JJ-1040713 or the Life Insurance Trust.

80.    On information and belief, the certificate of life insurance bearing certificate no. JJ-1040713 was being funded via a premium financing loan, or with funds borrowed, advanced or paid from another person or entity.

81.    On information and belief, the representations and statements provided to the medical examiner and contained in the **MEDICAL SUPPLEMENT (Part II of Application – To be completed by Medical Examiner)** are inaccurate and false.

82.    On information and belief, the representations and statements contained in response to questions 12-16, 19, 22-25 and 35-37 on the insurance application and the answers on the **INSURED & OWNER PREMIUM FINANCING QUESTIONNAIRE** are inaccurate and false.

83.    On information and belief, the representations and statements made by Weindling

in the insurance application under the section titled, "**REQUIRED PRODUCER &
REPRESENTATIVE CERTIFICATION REGARDING INVESTOR OWNED LIFE
INSURANCE** " and in the **AGENT'S REPORT** are inaccurate and false.

84.     On information and belief, the entire transaction involving the application for and
issuance of the Policy was a complete sham and subterfuge created and designed to avoid the
insurable interest laws of the State of New Jersey.

85.     On information and belief, the Plaintiff and Third Party Defendants procured the
Policy as part of a pre-conceived plan and scheme to avoid the insurable interest laws, when in
truth and fact the transaction was induced by the Plaintiff and Third Party Defendants who lacked
any legally insurable interest in the life of Irizarry and for the Plaintiff and Third Party Defendants'
benefit.

86.     On information and belief, Irizarry provided no input into the drafting of the Life
Insurance Trust and the Life Insurance Trust did not benefit Irizarry's family or other person with
a legally recognizable insurable interest in her life.

87.     On information and belief, the Life Insurance Trust was established by the Plaintiff
and Third Party Defendants, and other persons whose identity are not known, as a vehicle through
which the Plaintiff and Third Party Defendants could procure the issuance of the Policy insuring
the life of Irizarry, thereby hiding and disguising that the beneficiaries of the Life Insurance Trust
lack any insurable interest in the life of Irizarry and/or to obtain financing from third-parties to pay
premiums in consideration for the receipt of an interest in the death benefit to be paid upon the
death of Irizarry.

88.     On information and belief, at the time of the application for and issuance of the
certificate of life insurance, Irizarry could not afford to pay the premiums on the Policy.

89.     On information and belief, third persons whose identities are not yet known to Lincoln National contributed to the payment of the premiums of the Policy.

90.     Lincoln National's investigation further revealed that Third Party Defendant Lebovits individually and as Vice President and Managing General Agent of Third Party Defendant Liberty and in his position of authority over Third Party Defendant Rocklyn was indicted in the United States District Court Eastern District of New York on charges of (1) Conspiracy To Commit Mail Fraud and Wire Fraud, (2) Conspiracy To Commit Money Laundering, (3) Mail Fraud, (4) Wire Fraud and (5) Money Laundering in connection with a scheme designed to fraudulently induce insurance companies to issue policies with high death benefits to elderly insureds and use a portion of the scheme profits to make subsequent investments in policies that were part of the scheme.

91.     According to the Indictment:

a.   Lebovits "engaged in a scheme to designed to fraudulently induce insurance companies, their corporate subsidies and related companies (collectively, the "Insurance Companies"), to issue policies with high death benefits to elderly insureds."

b.   Lebovits was a licensed agent who sold policies to elderly insureds and the insurance agency was Liberty Planning, the Rocklyn Group or another associated insurance agency.

c.   In furtherance of the scheme, Lebovits "caused the submission of applications with materially false statements to the Insurance Companies…The false statements were that: (1) the insureds had large net worths and annual incomes, above their true net worths and incomes;  (2) neither the insureds nor the owners intended to resell the policies on the secondary market for life insurance;  (3) the insureds and the owners

intended to pay the premiums themselves with their own money;   (4) neither the insureds nor the owners had been compensated or were promised compensation for applying for the policies; (5) the insured and the owners did not obtain, and would not hold the policies for others who were investing in the insureds' life; and (6) the purpose of the insurance policies were 'estate Planning,' 'estate Liquidity,' 'estate conservation' or some equivalent description."

d.   During the periods of contestability of such fraudulently induced policies, and in furtherance of the scheme, Lebovits made and caused to be made additional material false statements to the Insurance Companies, including statement that they were not aware that investors paid premiums on the policies.

e.   Lebovits recruited elderly people of modest means (the "Straw Buyers") to apply for life insurance policies with high death benefits from the Insurance Companies. Lebovits paid cash and promised other financial incentives to the Straw Buyers in exchange for the Straw Buyers submitting applications for life insurance policies to the Insurance Companies.

f.   Lebovits engaged in financial transactions designed to falsely convince Insurance Companies that the Straw Buyers were personally paying the policies by establishing bank accounts in the names of irrevocable life insurance trusts for the Straw Buyers and funding those accounts by exchanging money between himself, Liberty Planning and the Rocklyn Group.

g.   Lebovits' goal was "to profit from the scheme through: (1) the death benefits they would collect if the Straw Buyers died before the periods of contestability expired; (2) the commissions that Liberty Planning, other insurance agencies… and other insurance

agents who participated in the scheme would receive from the premiums paid during the periods of contestability; and (3) the profits that the defendants could make by reselling the policies on the secondary market once the periods of contestability expired."

92.     On information and belief, Weindling, Liberty, Rocklyn and Lebovits have, at all material times hereto, knowingly and purposefully acted as agents for Irizarry, Negron and Fischer and conspired with them to procure life insurance policies and/or certificates under false and fraudulent pretenses.

93.     On information and belief the actions and omissions of Weindling, Liberty, Rocklyn and Lebovits in connection with the issuance of the certificate of life insurance were part of a plan and scheme set forth in the above referenced indictment and incorporated herein by reference as if set forth in length.

94.     Negron, Fischer and Irizarry knowingly and intentionally failed and omitted to disclose material facts; and otherwise knowingly and intentionally failed to accurately, honestly and/or truthfully disclose material information in response to the questions present on the insurance applications which, if disclosed, Lincoln National would have declined to issue the certificate of life insurance.

95.     Lincoln National has no adequate remedy at law and therefore seeks that the certificate of life insurance bearing certificate no. JJ-7040713 be declared null and void and rescinded, *ab initio*.

96.     Alternatively, by reason of the foregoing, the certificate of life insurance is void as against public policy, as there exists no insurable interest and/or no mutual consent and meeting of the minds between Irizarry and Lincoln National.

28

97.     Lincoln National has been damaged by virtue of Plaintiff's and Third Party Defendants' material misrepresentations and has incurred damages, expenses and costs in connection with, among other things, its underwriting and issuance of the certificate of insurance, payment of commissions and fees in connection with issuance of the certificate of insurance, administration and servicing of the certificate of insurance, investigation of the misrepresentation, fraud, and concealment outlined above, and commencement of the present litigation to enforce its rights.

98.     In light of the foregoing damages, expenses and costs incurred by Lincoln National, Lincoln National should be permitted to retain the premiums paid for the certificate of insurance as an offset against such damages and costs.

99.     Notwithstanding the foregoing, Lincoln National stands ready, willing and able to refund or otherwise make payment of all or any portion of the premiums paid for the certificate of insurance as directed by the court in accordance with Lincoln National's demand for rescission for the certificate of insurance and restoration of the parties to their relative pre-contract positions insofar as is possible and equitable.

100.    Accordingly, Lincoln National hereby makes constructive tender of the premiums paid for the certificate of insurance and respectively seeks the court's direction as to the actual payment of same.

## FIRST COUNT

101.    Lincoln National repeats and realleges each and every allegation contained in paragraphs 1 through 100, inclusive, as if same were fully set forth at length herein.

102.    On information and belief, Lincoln National reasonably believes there was no mutual consent and meeting of the minds between Decedent and Lincoln National and as a

consequence of same the policy of life insurance is void, *ab initio*.

103.    By reason of the foregoing, Lincoln National reasonably believes that the policies of life insurance are void as same were procured by material misrepresentation.

104.    By reason of the foregoing, the policy of life insurance is void as against public policy as there exists no insurable interest in the life of the Decedent.

105.    Lincoln National has no adequate remedy at law and therefore seeks that the certificate of life insurance bearing policy no JJ-7040713 be declared null and void and rescinded, *ab initio*.

**WHEREFORE**, Lincoln National demands judgment against Plaintiff and Third Party Defendants, and each of them, for relief more particular described as follows:

A)    An order declaring and adjudging the certificate of life insurance no. JJ-7040713 to be null and void and rescinded, *ab initio*; and

B)    An order declaring that Lincoln National is entitled to keep all premiums paid under the certificate of insurance as offset against damages, costs, fees and expenses incurred by Lincoln National on account of the Plaintiff and Third Party Defendants' fraudulent conduct as necessary to restore Lincoln National to its pre-contract position; and/or in the alternative permitting Lincoln National to deposit with the Clerk of the Court monies representing premiums received for the certificate of insurance, to be held pending the court's determination as to the parties respective rights, obligations and liabilities; and

C)    An order providing a monetary judgment in favor of Lincoln National in an amount to be determined at the time of trial representing the amount of commissions paid, expense incurred and damages sustained, less premiums received; and

D)     An order awarding prejudgment interest, post judgment interest, costs of suit, reasonable attorney fees and such other relief as the court deems equitable and just.

## SECOND COUNT

106.    Lincoln National repeats and realleges each and every allegation contained in paragraphs 1 through 105, inclusive, as if same were fully set forth at length herein.

107.    Negron, Fischer and Irizarry knowingly, negligently and/or innocently made material misstatements of fact; failed to disclose material facts in response to the questions present on the insurance applications; and otherwise failed, refused and/or omitted to disclose material facts, all of which as aforesaid.

108.    Lincoln National has no adequate remedy at law and therefore seeks that the certificate of life insurance bearing certificate no. JJ-7040713 be declared null and void and rescinded, *ab initio*.

**WHEREFORE**, Lincoln National demands judgment against Negron, Fischer and Irizarry, and each of them, for relief more particular described as follows:

A)     An order declaring and adjudging the certificate of life insurance no. JJ-7040713 to be null and void and rescinded, *ab initio*; and

B)     An order declaring that Lincoln National is entitled to keep all premiums paid under the certificate of insurance as offset against damages, costs, fees and expenses incurred by Lincoln National on account of Negron, Fischer and Irizarry's fraudulent conduct as necessary to restore Lincoln National to its pre-contract position; and/or in the alternative permitting Lincoln National to deposit with the Clerk of the Court monies representing premiums received for the certificate of insurance, to be held pending the court's determination as to the parties respective rights, obligations and liabilities; and

31

C)      An order providing a monetary judgment in favor of Lincoln National in an amount to be determined at the time of trial representing the amount of commissions paid, expense incurred and damages sustained, less premiums received; and

D)      An order awarding prejudgment interest, post judgment interest, costs of suit, reasonable attorney fees and such other relief as the court deems equitable and just.

## THIRD COUNT

109.    Lincoln National repeats and realleges each and every allegation contained in paragraphs 1 through 108, inclusive, as if same were fully set forth at length herein.

110.    Lincoln National issued the certificate of life insurance bearing certificate no. JJ-7040713 pursuant to, and in accordance with, a mistake of fact all of which as aforesaid.

111.    Lincoln National has no adequate remedy at law and therefore seeks that the certificate of life insurance bearing certificate no. JJ-7040713 be declared null and void and rescinded, *ab initio*.

**WHEREFORE**, Lincoln National demands judgment against Negron, Fischer and Irizarry, and each of them, for relief more particular described as follows:

A)      An order declaring and adjudging the certificate of life insurance no. JJ-7040713 to be null and void and rescinded, *ab initio*; and

B)      An order declaring that Lincoln National is entitled to keep all premiums paid under the certificate of insurance as offset against damages, costs, fees and expenses incurred by Lincoln National on account of Negron, Fischer and Irizarry's fraudulent conduct as necessary to restore Lincoln National to its pre-contract position; and/or in the alternative permitting Lincoln National to deposit with the Clerk of the Court monies representing premiums received for the certificate of

insurance, to be held pending the court's determination as to the parties respective rights, obligations and liabilities; and

C)     An order providing a monetary judgment in favor of Lincoln National in an amount to be determined at the time of trial representing the amount of commissions paid, expense incurred and damages sustained, less premiums received; and

D)     An order awarding prejudgment interest, post judgment interest, costs of suit, reasonable attorney fees and such other relief as the court deems equitable and just.

## FOURTH COUNT

112.   Lincoln National repeats and realleges each and every allegation contained in paragraphs 1 through 111, inclusive, as if same were fully set forth at length herein.

113.   As is more fully set forth herein, Weindling, Liberty, Rocklyn and Lebovits knowingly and intentionally misrepresented, concealed and/or failed to disclose the occurrence of events as well as facts and information elicited in the applications and/or during the processing of the applications which materially affected the Life Insurance Trust's initial and continued right and entitlement to receive the certificate of life insurance and/or any benefit thereunder, in violation of the New Jersey Insurance Fraud Prevention Act and, in particular, N.J.S.A. 17:33A-4.

114.   As is more fully set forth herein, Weindling, Liberty, Rocklyn and Lebovits knowingly and intentionally assisted, conspired with and/or urged Irizarry, Negron and Fischer to knowingly and intentionally misrepresent, conceal and/or fail to disclose the occurrence of events as well as facts and information elicited in the application which materially affected their initial and continued right to receive the certificate of life insurance and/or any benefit thereunder, in violation of the New Jersey Insurance Fraud Prevention Act and, in particular, N.J.S.A. 17:33A-4.

115.   As is more fully set forth herein, Weindling, Liberty, Rocklyn and Lebovits

knowingly and intentionally benefited, both directly and indirectly, from Irizarry, Negron and

Fischer's knowing and intentional misrepresentations, concealment and/or failures to disclose the

occurrence of events as well as facts and information elicited in the applications, which materially

affected Negron and Fischer's initial and continued right and entitlement to receive the certificate

of life insurance and/or any benefit thereunder, in violation of the New Jersey Insurance Fraud

Prevention Act and, in particular, N.J.S.A. 17:33A-4.

116.   As is more fully set forth herein, Irizarry, Negron and Fischer knowingly and

intentionally misrepresented, concealed, and/or failed to disclose the occurrence of events as well

as facts and information elicited in the applications which materially affected the Life Insurance

Trust's initial and continued right and entitlement to receive the certificate of life insurance and/or

any benefit thereunder, in violation of the New Jersey Insurance Fraud Prevention Act and, in

particular, N.J.S.A. 17:33A-4.

117.   As more fully set forth herein, Irizarry, Negron and Fischer knowingly and

intentionally made written and/or oral statements intended to be presented for the purpose of

obtaining insurance policies knowing that the statements contained false and misleading

information material to the insurance applications and policies within the meaning and intent of the

New Jersey Insurance Fraud Prevention Act and, in particular, N.J.S.A. 17:33A-4.

118.   As more fully set forth herein, Irizarry, Negron and Fischer knowingly and

intentionally conspired with and/or urged Weindling, Liberty, Rocklyn and Lebovits to knowingly

and intentionally misrepresent, conceal and/or fail to disclose the occurrence of events as well as

facts and information in the applications and/or during the processing of the applications which

materially affected their initial and continued right and entitlement to receive the certificate of life

insurance and/or any benefit thereunder, in violation of the New Jersey Insurance Fraud Prevention

Act and, in particular, <u>N.J.S.A.</u> 17:33A-4.

119.    The acts and omissions of Irizarry, Negron, Fischer, Weindling, Liberty, Rocklyn and Lebovits as set forth herein constitute a violation of the New Jersey Insurance Fraud Prevention Act, and as a consequence of such violation, Lincoln National has and will continue to sustain damages.

**WHEREFORE**, Lincoln National demands judgment against Plaintiff and Third Party Defendants, and each of them, for relief more particularly described as follows:

A)    An order declaring and adjudging the certificate of life insurance bearing certificate no. JJ 7040713 to be null, void, rescinded and of no legal force and effect of whatsoever nature; and

B)    An order awarding a monetary judgment in favour of Lincoln National providing compensatory, consequential and treble damages; and

C)    An order awarding restitution of any and all benefits which may otherwise be due and/or payable; and

D)    An order awarding costs of investigation, reasonable attorney fees, costs of suit, prejudgment interest, post judgment interest and such other relief as the court deems equitable and just.

## FIFTH COUNT

120.    Lincoln National repeats and realleges each and every allegation contained in paragraphs 1 through 119, inclusive, as if same were fully set forth at length herein.

121.    As is more fully set forth herein, Weindling, Liberty, Rocklyn and Lebovits knowingly and intentionally misrepresented, concealed and/or failed to disclose the occurrence of events as well as facts and information elicited in the insurance applications; and otherwise

35

knowingly and intentionally failed to accurately, honestly and/or truthfully disclose material information in response to questions present on the insurance applications and in the processing of those applications.

122.    As is more fully set forth herein, Weindling, Liberty, Rocklyn and Lebovits, through submission of applications knowing that said applications contained false information, and through representations and statements to Lincoln National that were materially false; knowingly schemed and conspired to fraudulently induce Lincoln National to issue the certificate of life insurance.

123.    As is more fully set forth herein, Weindling, Liberty, Rocklyn and Lebovits were aware that the knowing and intentional material misrepresentations and/or omissions would be relied upon by Lincoln National in deciding whether to issue the certificate of life insurance.

124.    As is more fully set forth herein, Lincoln National relied upon Weindling, Liberty, Rocklyn and Lebovits' knowing and intentional material misrepresentations and/or omissions and was thereby fraudulently induced into issuing the certificate of life insurance bearing certificate no. JJ 7040713.

125.    The reliance by Lincoln National on Weindling, Liberty, Rocklyn and Lebovits' knowing and intentional material misrepresentations and/or omissions was justified under all of the circumstances.

126.    As a direct and proximate result of Weindling, Liberty, Rocklyn and Lebovits' knowing and intentional misrepresentations and/or omissions, Lincoln National has suffered damages in that it issued the certificate of life insurance which it would not have otherwise issued, incurred brokerage commissions, and other expenses fees and costs, including attorney fees, and may be required to make future payments under the certificate of life insurance.

**WHEREFORE**, Lincoln National demands judgment against Third Party Defendants Weindling, Liberty, Rocklyn and Lebovits for compensatory damages, including all sums that Lincoln National has incurred or may in the future incur as a result of the issuance of the certificate of life insurance, together with lawful interest, consequential damages, punitive damages, reasonable costs of investigation, costs, reasonable attorney fees, and such other relief as the court deems equitable and just.

### SIXTH COUNT

127.  Lincoln National repeats and realleges each and every allegation contained in paragraphs 1 through 126, inclusive, as if same were fully set forth at length herein.

128.  Weindling, Liberty, Rocklyn and Lebovits negligently and recklessly misrepresented, concealed and/or failed to disclose material facts, as well as the occurrence of events and information, elicited in the applications and/or during the processing of the applications; and otherwise failed, refused and/or omitted to disclose material facts, all of which as aforesaid.

129.  As is more fully set forth herein, Weindling, Liberty, Rocklyn and Lebovits was aware that their negligent and reckless material misrepresentations and/or omissions would be relied upon by Lincoln National in deciding whether to issue the certificate of life insurance.

130.  As is more fully set forth herein, Lincoln National relied upon Weindling, Liberty, Rocklyn and Lebovits' negligent and reckless material misrepresentations and/or omissions and was thereby fraudulently induced into issuing the certificate of life insurance bearing certificate no. JJ 7040713.

131.  The reliance by Lincoln National on Weindling, Liberty, Rocklyn and Lebovits' negligent and reckless material misrepresentations was justified under all of the circumstances

132.   As a direct and proximate result of Weindling, Liberty, Rocklyn and Lebovits' negligent and reckless misrepresentations and/or omissions, Lincoln National has suffered damages in that it issued the certificate of life insurance which it would not have otherwise issued, incurred brokerage commissions, and other expenses fees and costs, including attorney fees, and may be required to make future payments under the certificate of life insurance.

**WHEREFORE**, Lincoln National demands judgment against Third Party Defendant Weindling, Liberty, Rocklyn and Lebovits for compensatory damages, including all sums that Lincoln National has incurred or may in the future incur as a result of the issuance of the certificate of life insurance, together with lawful interest, consequential damages, reasonable costs of investigation, costs, reasonable attorney fees, and such other relief as the court deems equitable and just.

## SEVENTH COUNT

133.   Lincoln National repeats and re-alleges each and every allegation contained in paragraphs 1 through 132, inclusive, as if same were fully set forth at length herein.

134.   At all times relevant to the action, Weindling, Liberty, Rocklyn and Lebovits were licensed insurance agents and/or insurance producers.

135.   At all times relevant to the action, Weindling, Liberty, Rocklyn and Lebovits professed and held out to the public in general and to Lincoln National in particular, that they were skilled, careful, and diligent in the practice of procuring insurance.

136.   At all times relevant to the action, Weindling, Liberty, Rocklyn and Lebovits owed Lincoln National a duty to use reasonable and due care in the solicitation, application, and delivery of policies and/or certificates of life insurance.

137.   At all times relevant to the action, Weindling, Liberty, Rocklyn and Lebovits owed

Lincoln National a duty of care to insure that Lincoln National was fully informed of all facts material to the underwriting of the certificate of life insurance.

138.   At all times relevant to the action, Weindling, Liberty, Rocklyn and Lebovits owed Lincoln National a duty not to lie, conceal or otherwise misrepresent facts or information.

139.   At all times relevant to the action, Weindling, Liberty, Rocklyn and Lebovits owed a duty to Lincoln National to investigate and inquire into, *inter alia*, the insured's ability to pay the premiums on the certificate of life insurance; the insured's net worth; and the amount of other life insurance the insured had in force and/or had applied for.

140.   At all times relevant to the action, Weindling, Liberty, Rocklyn and Lebovits owed a duty to Lincoln National not to engage in a scheme and/or conspiracy to procure life insurance from Lincoln National in violation of the insurable interest laws of the State of New Jersey.

141.   As is more fully set forth herein, Weindling, Liberty, Rocklyn and Lebovits breached all of the aforementioned duties of care due and owing to Lincoln National.

142.   As a direct and proximate result of Weindling's, Liberty's, Rocklyn's and Lebovits' breach of their duties of care and diligence to Lincoln National, Lincoln National has sustained damages.

**WHEREFORE**, Lincoln National demands judgment against Third Party Defendants Weindling, Liberty, Rocklyn and Lebovits for compensatory damages, including all sums that Lincoln National has incurred or may in the future incur as a result of the issuance of the certificate of life insurance, together with lawful interest, consequential damages, reasonable costs of investigation, costs, reasonable attorney fees, and such other relief as the court deems equitable and just.

## EIGTH COUNT

143.   Lincoln National repeats and re-alleges each and every allegation contained in paragraphs 1 through 142, inclusive, as if same were fully set forth at length herein.

144.   At all times relevant to the action, Weindling and Lebovits and other third persons were acting within the scope of their employment with Liberty and Rocklyn as either an employee, agent or representative of Liberty and Rocklyn.

145.   At all times relevant to the action, Liberty and Rocklyn knew or had reason to know of Weindling's, Lebovits' and other third persons' negligence, particular unfitness, incompetence, and dangerous attributes and could have reasonably foreseen that such qualities created a risk of harm to insurance companies such as Lincoln National.

146.   As a direct and proximate result of the acts and omissions of Weindling, Lebovits and/or other third persons, Lincoln National has been injured.

**WHEREFORE**, Lincoln National demands judgment against Third Party Defendants Liberty and Rocklyn for compensatory damages, including all sums that Lincoln National has incurred or may in the future incur as a result of the issuance of the certificate of life insurance, together with lawful interest, consequential damages, reasonable costs of investigation, costs, reasonable attorney fees, and such other relief as the court deems equitable and just.

MCELROY, DEUTSCH, MULVANEY
   & CARPENTER, LLP
Attorneys for Defendant/Third Party Plaintiff, Lincoln
National Life Insurance Company

By:
        Steven P. Del Mauro, Esq.

Dated:  March 23, 2011
1561828_1

40